

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-1-2007

# Marcavage v. Bd Trustees Temple

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5521

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Marcavage v. Bd Trustees Temple" (2007). *2007 Decisions*. Paper 1149.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1149

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-5521

MICHAEL ANTHONY MARCAVAGE,

Appellant

v.

BOARD OF TRUSTEES OF TEMPLE
UNIVERSITY OF THE COMMONWEALTH
SYSTEM OF HIGHER EDUCATION;
WILLIAM BERGMAN, INDIVIDUALLY,
AND IN HIS OFFICIAL CAPACITY
AS VICE PRESIDENT OF OPERATIONS
FOR TEMPLE UNIVERSITY;
CARL BITTENBENDER, INDIVIDUALLY,
AND IN HIS OFFICIAL CAPACITY
AS MANAGING DIRECTOR OF CAMPUS
SAFETY SERVICES FOR TEMPLE UNIVERSITY

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 00-cv-05362)
District Judge: The Honorable Petrese B. Tucker

Argued February 15, 2007

Before: SMITH and FISHER, *Circuit Judges*
and DOWD, *District Judge*[*]

---

[*]The Honorable David D. Dowd, Jr., Senior District Judge for the Northern District of
Ohio, sitting by designation.

(Filed: May 1, 2007)

Brian Fahling (argued)
Stephen M. Crampton
Michael J. DePrimo
AFA Center for Law & Policy
100 Parkgate Dr., Suite 2-B, Post Office Drawer 2440
Tupelo, MS 38803
        *Counsel for Appellant*

Joe H. Tucker, Jr. (argued)
Bacardi L. Jackson
Booth & Tucker, LLP
One Penn Center at Suburban Station
1617 JFK Blvd., Suite 1700
Philadelphia, PA 19103
        *Counsel for Appellees*

-------

## OPINION

-------

SMITH, *Circuit Judge*.

The main issue in this case is whether the District Judge should have disqualified

herself pursuant to 28 U.S.C. § 455(a). We conclude that the District Judge did not abuse

her discretion by not disqualifying herself pursuant to § 455(a). We also note that, even if

the language of the District Judge's written order denying the § 455(a) motion created a

situation where her impartiality might be reasonably questioned, no party was harmed by

any rulings made by the District Judge during the course of these proceedings. We will

therefore affirm. We find no error in the District Court's orders at issue in this appeal,

including the District Judge's decision to permit an expert to testify as to reasonableness

under Pennsylvania's Mental Health Procedures Act (MHPA), 50 PA. CONS. STAT. ANN. § 7101 *et seq.*

## I.

Because we write primarily for the parties, we omit a discussion of facts not relevant to our disposition. This case arises out of a series of unfortunate incidents involving Plaintiff/Appellant Michael Marcavage, then a Dean's List student at Temple University, and high-ranking Temple officials. During the Fall 1999 semester, Marcavage learned of an upcoming campus-sponsored play that planned on depicting Jesus Christ and his disciples as gay. This production offended Marcavage. In late October and early November 1999, Marcavage began meeting with the University's Vice President of Operations, William Bergman, and Director of Campus Safety, Carl Bittenbender, to see if he could arrange logistics for a protest event that he was organizing. This alternative event, scheduled to occur in early November, would portray Jesus in a different light than the event that depicted him and his disciples as gay.

The meeting that formed the basis for this lawsuit occurred on November 2, 1999. Marcavage, Bergman, and Bittenbender met in Bergman's office to discuss the logistics of Marcavage's play. Immediately prior to this meeting, Marcavage met with a secretary at the Board of Trustees' office. While the parties disagree as to what happened between Marcavage and the secretary, the secretary pressed the panic button to summon campus police because she believed Marcavage was making a commotion in the office. Bergman responded personally, and took Marcavage to his office. In the office, Bergman told

3

Marcavage that the University would not provide a stage for his event. The interpretations of Marcavage's actions in the office differ significantly between Bergman and Bittenbender on one hand and Marcavage on the other.

According to Bittenbender, during this meeting Marcavage began to cry and then sob, shake, and otherwise behave erratically. Bittenbender testified that Marcavage then hopped up out of his chair, said "it's over," and ran into the bathroom, slamming and locking the door. Bittenbender became concerned about Marcavage's safety, and testified that he shouted to Marcavage to see if he was doing all right. Bittenbender testified that he banged and kicked on the bathroom door and then frantically asked for the keys to the bathroom, worrying that Marcavage might be trying to commit suicide. After about fifteen minutes, Marcavage came out of the bathroom and, according to Bittenbender, looked like he was going to collapse. Bergman provided similar testimony.

Marcavage's version of events differs greatly. He testified that, after the officials told him that the stage would not be provided, tears welled up in his eyes and he excused himself to go into a nearby restroom to pray. According to Marcavage, he locked the door and, "within moments," heard someone yelling for him to come out.

After these events, Dr. Denise Walton of the University's counseling center arrived. She found Marcavage to be very confused and in a great deal of crisis and distress. Dr. Walton testified that "the most humane thing was for [Marcavage] to have an evaluation" because she saw him sobbing, his body occasionally jerked, he looked confused, and "at times it didn't even look like he understood that [she] was there or he

4

didn't even understand what [she] was saying." Bittenbender then ordered Marcavage to be evaluated for his own protection pursuant to Pennsylvania's MHPA. Marcavage was transported by campus police to the Temple University Hospital. Bittenbender then filled out the paperwork for the "302 Application" for Marcavage's involuntary examination. *See* 50 PA. CONS. STAT. ANN. § 7302. After doctors at the hospital concluded that Marcavage was not in need of emergency involuntary treatment, Marcavage was released.

Marcavage then filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights. Marcavage alleged that, in retaliation for the exercise of his First Amendment rights, he was assaulted, physically restrained, placed in custody, and forced to undergo an involuntary mental examination pursuant to §§ 301 and 302 of the MHPA. *See* 50 PA. CONS. STAT. ANN. §§ 7301, 7302. Marcavage also included several state law claims in his suit. After several pre-trial rulings, the case went to trial. After the dismissal of some of the state law claims via Federal Rule of Civil Procedure 50, the jury returned a verdict in favor of the defendants. Marcavage's appeal raises numerous issues, two of which we discuss here.[1]

II.

---

[1]The District Court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). We have jurisdiction under 28 U.S.C. § 1291. In addition to the issues we discuss here, Marcavage also argues that the District Court erred by: dismissing some of his state and federal claims at the summary judgment stage and through Rule 50, dismissing Temple University as a defendant, issuing improper jury instructions, excluding two doctors' records and testimony, and limiting the scope of cross-examination of an expert witness. We find no error in these District Court rulings.

28 U.S.C. § 455(a) states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[2] In a Motion for Recusal filed on July 17, 2002, Marcavage argued that the District Judge's impartiality could be reasonably questioned for three reasons. First, Marcavage noted that the District Judge and the lead counsel for the defense are both members of the Barristers' Association, and that trial counsel for the defense, in his capacity as president of the Association, commented on the District Judge's selection by the Association for an award. Referring to the award selection, which took place during the pendency of the case, defense counsel stated that the District Judge was a "friend[] of the Barristers' Association" who "gives both her time and her ear to Barristers' members." Second, Marcavage pointed to the fact that the District Judge received two awards from two Temple University Beasley School of Law student organizations. Finally, he complained that the District Judge did not disclose the awards or appearances at these events.

The defendants objected to the plaintiff's recusal motion, and suggested that, aside from the stated recusal reasons, Marcavage's argument "suggests a more darker and sinister belief as the true basis for his recusal motion." The defendants asserted that, according to the plaintiff's argument:

---

[2]We use the terms "recusal" and "disqualification" interchangeably, consistent with the way the parties and the District Court used them. *See In re Sch. Asbestos Litig.*, 977 F.2d 764, 769 n.1 (3d Cir. 1992).

> Her Honor would have to recuse herself every time a Barristers' Association member represented a party. Plaintiff's counsel surely does not suggest that every time a Catholic lawyer appears in front of a Catholic judge that the judge should recuse himself because they too are members of the same religion. This thinking is improper, ludicrous and, worse off, dangerous.

Referring to *Commonwealth of Pennsylvania v. Local Union 542*, 388 F.Supp. 155 (E.D. Pa. 1974),[3] the defendants charged that "lawyers like Mr. Fahling [] would attempt to intimidate black judges and lawyers by arguing in effect that blacks should essentially not be allowed to practice law before black judges and black judges must disassociate themselves from their race." The defendants also discussed why the District Judge's affiliation with Temple University is not grounds for recusal.

The District Judge denied Marcavage's disqualification motion. Marcavage filed a mandamus petition, which was summarily denied by this Court. The disqualification review that we now conduct focuses on two different sets of facts. The first set relates to the District Judge's activities that led Marcavage to seek disqualification. The second set is contained in the District Judge's statements discussing her denial of Marcavage's recusal motion. "Where a motion for disqualification was made in the District Court, we review the denial of such a motion for abuse of discretion." *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 166 (3d Cir. 2004). We may review both sets of facts

---

[3]The famous and eloquent opinion in *Local Union 542* was authored by then-District Judge Leon Higginbotham. In it, he rejects a recusal motion in a civil rights suit. The groundless motion raised his leadership in the civil rights movement as a basis for disqualification.

"because the ultimate issue here is whether the public can have confidence in the integrity of the court's judgments." *Id*. at 169. Our review is objective, so that we focus on whether an "observer reasonably might question the judge's partiality." *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997); *In re Kensington Int'l Ltd.*, 353 F.3d 211, 220 (3d Cir. 2003). The disqualification statute seeks to balance the need for federal judges to be free of actual and apparent bias or prejudice against the need to prevent counsel from essentially having a veto over whether a particular judge hears a case. *See In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2001).

The District Judge did not abuse her discretion by not recusing herself because of her connections with the Barrister's Association, Temple University, or the lead defense counsel. "[W]hether to recuse from hearing a matter lies within the sound discretion of the trial judge." *United States v. Wilensky*, 757 F.2d 594, 599-600 (3d Cir. 1985). Common membership in a legal organization between a judge and counsel is not, by itself, enough to create a situation in which a judge's impartiality might reasonably be questioned. Any other rule would potentially preclude a substantial number of judges from presiding over cases before a large portion of the bar. Similarly, in this case, the District Judge's minimal contacts with her law school alma mater contained in the record before us do not constitute grounds for disqualification. *See United States v. Nackman*, 145 F.3d 1069, 1076 (9th Cir. 1998) (collecting cases from several circuits as support for this non-controversial point). Finally, the District Judge did not abuse her discretion

8

when she declined to recuse herself because of her relationship with the lead defense counsel. There are a variety of reasonable interpretations of defense counsel's statement that the District Judge is a "friend[] of the Barristers' Association" who "gives both her time and her ear to Barristers' members." The District Judge stated that "a reasonable person would undoubtedly draw the conclusion that the Barristers' Association had my attention for the purpose of advancing its mission."[4] This interpretation of the defense counsel's statement is reasonable, and it certainly does not rise to the level of an abuse of discretion. *See, e.g.*, *Henderson v. Dep't of Pub. Safety and Corr.*, 901 F.2d 1288, 1295-96 (5th Cir. 1990) (affirming a denial of a § 455(a) motion where the trial judge and opposing counsel knew each other for a long time and the judge had been a friend of the opposing counsel's late father).

The District Judge was not required to recuse herself under § 455(a) because of these connections. We need not decide whether the District Judge's memorandum and order denying the plaintiff's motion to recuse created a situation where her "impartiality might reasonably be questioned." *See* 28 U.S.C. § 455(a). We conclude that any possible error was harmless, and therefore make no ultimate decision as to any potential appearance of impartiality. We write only to illustrate some of our concerns. The District Judge labeled the plaintiff's argument as "full of vehemence and innuendo."

---

[4]According to its website, "the Barristers' Association's purpose, then and now, has been to address the professional needs and development of African American lawyers in the City of Philadelphia and surrounding counties through programs such as seminars, cultural events, and publications." *See* http://www.phillybarristers.org/index.html.

More specifically, the District Judge referred to the "true motivation underlying" the plaintiff's disqualification motion, and proceeded to discuss the "race-based tactic such as the one present in this recusal motion." Mentioning two other federal judges who are members of the Barristers' Association, the District Judge stated that "since these distinguished jurists are also members of the dark cabal known as the Barristers' Association, it is reasonable to believe, if guided by Plaintiff's logic, that these gentlemen are similarly guided by a personal desire for a fellow Barristers' Association member to succeed. In any case, they would also be subject to disqualification under Plaintiff's analysis."

Marcavage argues, in contrast, that his recusal motion was not racially motivated. In Marcavage's view, he expressed a legitimate concern that the District Judge had a sufficiently close relationship with the lead defense counsel that her impartiality could be reasonably questioned. Marcavage contends that the purpose of the Barristers' Association is almost inconsequential. Marcavage's point is that the lead defense counsel was president of an organization that presented the District Judge with an award during the pendency of the case and stated that she "gives both her time and her ear to [the organization's] members."

With this background in mind, we do not decide whether the District Court's September 30, 2002 Memorandum and Order denying the Plaintiff's Motion for Recusal created a situation where her impartiality could be reasonably questioned because harmless error applies. The Supreme Court has stated that "[t]here need not be a

10

draconian remedy for every violation of § 455(a)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988). There are three factors that we must consider in determining the remedy: "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id*. at 864. While these three factors were applied in the context of a Rule 60(b) motion in *Liljeberg*, this Court has used the *Liljeberg* analysis more broadly to determine whether prior rulings should be vacated. *See In re Sch. Asbestos Litig.*, 977 F.2d 764, 785 (3d Cir. 1992). We have agreed with the majority position that harmless error applies to violations of § 455(a). *See Selkridge*, 360 F.3d at 171; *In re School Asbestos Litig.*, 977 F.2d at 786; *see also Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 42 n.10 (2d Cir. 2005); *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 485 (5th Cir. 2003); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1527 (11th Cir. 1988).

With respect to "the risk of injustice to the parties in the particular case," the able District Judge's trial rulings were all correct. After a careful review of the voluminous record, we have found no prejudice suffered by Marcavage as a result of these rulings. *See Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) (stating that "when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion").

The second factor of the *Liljeberg* test is "the risk that the denial of relief will

11

produce injustice in other cases." We can envision no future injustice as a consequence of this ruling, because there were no mistakes in the District Judge's actual trial rulings. Opening up a jury verdict would be an unnecessary and grossly inefficient remedy.

The analysis of the third factor, "the risk of undermining the public's confidence in the judicial process," also weighs in favor of finding the District Judge's disqualification error harmless. As we have already stated, her trial decisions were all proper. Further, ordering a new trial with a new judge risks harming the public's confidence in the judicial process. *See United States v. Cerceda*, 172 F.3d 806, 816 (11th Cir. 1999) ("Without evidence that bias could have tainted the outcome of the hearings, there is a significant risk that the public would find it unjust to require the Government to expend time and money to conduct these proceedings a second time.").

We therefore conclude that, under the three *Liljeberg* factors, Marcavage suffered no harm by the District Judge's failure to disqualify herself.

The next issue is whether Dr. Ilene Rosenstein should have been allowed to testify as to the reasonableness of Bittenbender's actions with respect to the MHPA. We review a district court's decision to admit expert testimony under the abuse of discretion standard. *United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997). "To show an abuse of discretion, appellants must show the district court's action was arbitrary, fanciful or clearly unreasonable. We will not disturb a trial court's exercise of discretion unless no reasonable person would adopt the district court's view." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002)

(citation and quotation marks omitted). This Court gives wide latitude to district courts in determining whether to admit expert testimony. *See Kannankeril v. Terminix Int'l., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) ("The Rules of Evidence embody a strong and undeniable preference for admitting *any evidence* which has the potential for assisting the trier of fact." (emphasis added)). This Court has stated that "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Id*. Further, Rule 704 states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *See Forrest v. Beloit Corp.*, 424 F.3d 344, 353 (3d Cir. 2005).

Section 301 of the MHPA provides for the involuntary emergency examination and treatment of severely mentally disabled individuals in need of immediate treatment. 50 PA. CONS. STAT. ANN. § 7301. Section 302 allows "authorized person[s]" to apply for such an examination. 50 PA. CONS. STAT. ANN. § 7302. "[T]he guiding inquiry must be whether, when viewing the surrounding facts and circumstances, a reasonable person in the position of the applicant … could have concluded that an individual was severely mentally disabled and in need of immediate treatment." *In re J.M.*, 726 A.2d 1041, 1049 (Pa. 1999). The MHPA provides broad immunity "to physicians and others who participate in the involuntary commitment process." *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 176 (3d Cir. 2004). Immunity from civil and criminal liability attaches unless the individual acts with "willful misconduct or gross negligence." 50 PA. CONS. STAT. ANN. § 7114(a).

13

We address the propriety of Dr. Rosenstein's testimony. With respect to Dr. Rosenstein's qualifications, she is the Director of the University of Pennsylvania's Counseling and Psychological Services. She received a Ph.D. in Counseling Psychology from the University of Missouri-Columbia, an M.Ed. in Counseling Psychology from the American University, and a B.A. in Psychology and Sociology from Ithaca College. She has been actively involved in college counseling since the early 1980s. According to her testimony, she has vast experience with § 302 examinations. Dr. Rosenstein testified that, during the academic year, Counseling and Psychological Services saw several cases a month that implicated the MHPA. She also ran seminars on emergency response and crisis intervention. Dr. Rosenstein has guest lectured on voluntary and involuntary exams and treatment. Her research focuses in part on university students with mental disorders. Dr. Rosenstein was also previously a psychiatric intake worker in a hospital setting.

With respect to her specific testimony, on direct examination she discussed her qualifications, her experience with the MHPA, and then the circumstances surrounding Marcavage's involuntary examination. On direct examination, she affirmatively answered the question of whether she could give an opinion within a reasonable degree of psychological certainty that Carl Bittenbender had reasonable grounds to believe that Marcavage was in the type of mental state to qualify for a Section 302 commitment. Dr. Rosenstein stated that she based her opinion on the testimony she heard and depositions she read. One representative exchange on direct examination illustrates this point:

Q: Would it have been appropriate based upon what you have heard for Mr.

14

Bittenbender and Mr. Bergman to let Mr. Marcavage leave that room in his state?

A: Absolutely not. First of all, I don't know how he could leave the room. He could hardly walk according to their testimony. And on top of that, even if he could, this was somebody who was in their mind, that's the important piece, in their perception as irrational, not in control of self, showing poor judgment, and really had a kind of demeanor and wasn't able to discern reality.

This type of testimony is admissible to aid the jury in deciding the reasonableness of Bittenbender's actions. Dr. Rosenstein's testimony also assisted the trier of fact in determining whether Bittenbender's actions were grossly negligent or willful. She was able to discuss these issues as an expert under the MHPA, and could therefore give her considered opinion as to Bittenbender's perception of Marcavage's psychological status.[5]

III.

For these reasons, we will affirm the orders of the District Court.

---

[5]There are statements made by Dr. Rosenstein on cross-examination that might be construed as vouching for Bittenbender and Bergman's testimony. However, these statements must be viewed against the backdrop of Dr. Rosenstein's entire testimony, where she repeatedly states that she was not present at the November 2, 1999 meeting and based her psychological opinion on depositions and testimony of other witnesses. Even if we were to conclude that the admission of Dr. Rosenstein's testimony was erroneous—which we do not—we would deem the error harmless because of the testimony of other witnesses who easily support the conclusion that Marcavage's involuntary examination was reasonable under the MHPA. *See Betterbox Communications Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) ("In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights. Under this standard, the admission of [the expert's] testimony, even if erroneous, was harmless." (citation omitted)).

DOWD, District Judge, concurring:

Although I concur in Judge Smith's opinion, I write separately with respect to one issue.

Marcavage argues that it was reversible error for the District Court to allow defendants' expert, Dr. Ilene Rosenstein, to testify on the ultimate issue of reasonableness under the MHPA, first, declaring that Bittenbender's application contained no false information (a fact that was strenuously disputed by the plaintiff at trial) and, second, declaring that, on the facts presented by Bittenbender, he acted reasonably when seeking the involuntary emergency examination of Marcavage.[6]

In my view, it was error for the District Court to permit expert testimony with respect to the question of whether Bittenbender acted reasonably. This is not a matter that requires expert testimony. I have no problem with Dr. Rosenstein's testifying as to the simple *procedural* steps which must be taken under the MHPA; however, her testimony went beyond that. In particular, I am troubled by what I consider to be, essentially, Dr. Rosenstein's "vouching" for Bittenbender's version of the facts as expressed by him in the application for the involuntary examination of Marcavage, as opposed to Marcavage's

---

[6]Marcavage argues that this error was exacerbated when the District Court refused to allow him to cross-examine Dr. Rosenstein regarding the medical reports of Drs. Villaluz and King, who examined Marcavage at the hospital and whose reports Dr. Rosenstein had considered when forming her own expert opinion.

version.[1]  During cross-examination, while being questioned with respect to the facts set forth by Bittenbender on the application form, the following exchange occurred:

> Q.  If I'm following, you have testified that the descriptive narrative that Mr. Bittenbender signed here under oath was sufficient to meet the requirements of the Mental Health Procedures Act, correct?
>
> A.  Let me say two parts to that.  One is that it doesn't matter if it was sufficient or not.  This was his statement of what he perceived was going on.  And in my mind -- so that is one piece.  Because there are many people who fill out -- who -- quite frankly, oftentimes it's rejected even when it's filled out by the mental health worker.  So there was enough in here that it was approved, even though it didn't need the approval in my mind.
>        The second part, as a psychologist reading -- as someone who does this all the time, it was sufficient stuff here to be of concern.
>
> Q.  When you say approved, you are referring to a mental health advocate?
>
> A.  Yes, I am.
>
> Q.  Now, the mental health advocate relies on the recommendations of the people making --
>
> A.  Correct.
>
> Q.  **So if he is not telling the truth and they say -- How significant is it that they approve an application that contains blatant false information?**
>
> A.  **I don't believe these have false information.**

---

[1]Dr. Rosenstein listened to the testimony of several witnesses at trial, including that of Bittenbender, but not that of Marcavage.  She was ill when Marcavage testified (*see* Trial Day 5 at 174); however, she did read his deposition testimony (*see*, Trial Day 5 at 195).

Q. I'm not asking that. How significant with the mental health advocate is it if it contains blatant falsehoods, is that significant then?

A. Is it significant? Yes, it's a problem.

(Trial Day 5 at 191-92, emphasis added). When further pressed, her testimony was as follows:

Q. Doctor, is it fair to say based on answers such as that one that you really don't allow for much possibility that there is another version of what happened that day that could have occurred, do you?

A. I believe what I said in this report, which is that, in fact, they did the exact thing I would want them to do. It was the right thing to do.

Q. But that all depends on your conclusion, Doctor -- and you're not the finder of facts -- that Mr. Marcavage was in fact irrational, was in fact mute; that there were legitimate reasons to be concerned?

A. His behavior as observed by Mr. Bittenbender clearly indicated to Mr. Bittenbender that this was a young man in crisis. This was beyond just slight agitation or annoyance. This was up to a point of serious mental illness. And because of that, he went ahead with the procedure.

Q. Doctor, can you assume that the actions of Defendant Bittenbender and Defendant Bergman in processing this application was not motivated by concern for his safety?

A. Why, no.

Q. You can't, can you?

A. I can't understand -- from reading everything, I could not understand why -- It seemed to me these were people that really, really cared and wanted to do a good job, I think, at

18

their university, and cared about safety. They are both policemen.

Q. It was a simply yes or no. I'm just thinking to limit -- so really you can't consider any alternate, can you?

A. I did consider the alternate. In the beginning when I went through all the stuff, I went with an open mind reading the stuff. **Mr. Tucker knows clearly I don't do this as a profession. I'm not an expert witness. I have another full-time job and a family. So going through this stuff, I didn't know which way I was going to go. My conclusion was absolutely that this was the right thing to do.**

(Trial Day 5 at 199-201, emphasis added).

In my view, the District Judge abused her discretion by allowing Dr. Rosenstein to testify as an expert *and* to wander into the province of the jury by testifying as to whose facts she believed.

That having been said, I would not conclude, in light of the record as a whole, that this was reversible error. There clearly was enough testimony from which the jury could have independently decided that Bittenbender's actions were reasonable and in compliance with the MHPA. In other words, although I believe it was error to allow Dr. Rosenstein to testify as to anything but the procedures relating to the MHPA, I also conclude that it was harmless error because the result would have been the same with or without her testimony.

I concur in the result.

19