

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-2008

# Svindland v. Nemours Fndtn Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2627

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Svindland v. Nemours Fndtn Inc" (2008). *2008 Decisions.* Paper 974.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/974

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-2627

_____

PAUL SVINDLAND and ALLISON SVINDLAND,
INDIVIDUALLY and as ADMINISTRATORS of the
ESTATE of IAN SVINDLAND, a MINOR, DECEASED
*Appellants*,

v.

THE NEMOURS FOUNDATION and
WILLIAM I. NORWOOD, M.D., Ph.D.
*Appellees*,

and

THE CHILDREN'S HOSPITAL OF PHILADELPHIA
and JAMES E. GOIN
*Intervenors*.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 05-cv–00417
District Judge: Honorable Berle M. Schiller

_____

ARGUED
May 15, 2008

_____

Before: McKee and Garth, *Circuit Judges*, and RODRIGUEZ, *District Judge*[*]
(Opinion Filed: June 26, 2008)

Theresa M. Blanco
Frank M. McClellan (Argued)
Eaton & McClellan
230 S. Broad Street – 3rd Floor
Philadelphia, PA 19102
        *Counsel for Appellants*

Richard E. Geschke
Sara Lynn Petrosky (Argued)
McCann & Geschke, P.C.
1800 John F. Kennedy Boulevard, Suite 801
Philadelphia, PA 19103
        *Counsel for Appellees The Nemours Foundation Inc. and*
        *William I. Norwood*

Alexander E. Dreier (Argued)
Catherine E. Stetson
Hogan & Hartson L.L.P.
555 13th Street, N.W.
Washington, D.C. 20004
        *Counsel for Intervenors The Children's Hospital of*
        *Philadelphia and James E. Goin*

_____

**OPINION**

_____


GARTH, *Circuit Judge*:

Paul and Allison Svindland appeal, individually and as administrators of the estate

_____

[*]The Honorable Joseph H. Rodriguez, Senior District Judge for the District of New Jersey, sitting by designation.

of Ian Svindland, from a jury verdict entered against them in a medical malpractice action filed in the United States District Court for the Eastern District of Pennsylvania. For the following reasons, we will vacate the jury's verdict and remand for further proceedings consistent with this opinion.

## I.

The parties are fully familiar with the proceedings that have taken place heretofore. Essentially, the Svindlands' son, Ian, was diagnosed with a developmental heart condition known as Ventricular Septal Defect ("VSD"). A VSD is a hole in the wall separating the two pumping chambers of the heart, allowing blood to pass from the left ventricle to the right ventricle. Dr. William I. Norwood performed heart surgery to correct Ian's VSD after he was born. The surgery was performed at The Nemours Cardiac Center in Delaware.

To perform the surgery, Dr. Norwood used a procedure known as Deep Hypothermic Circulatory Arrest ("DHCA"). This involved connecting Ian to a heart-lung bypass machine and using an attached refrigeration unit to cool his body. The purpose of this technique was to drain all of the blood from Ian's body to enable Dr. Norwood to perform the operation in a bloodless field. Cooling was necessary to reduce the amount of oxygen required by Ian's organs in the absence of blood flow.

The Svindlands concentrated on two issues at trial. They claimed that Dr. Norwood only cooled Ian for six minutes, which was not long enough to protect Ian's

organs, and ultimately caused his death. They also claimed that the information given to them in order to constitute informed consent did not acquaint them with the mortality risks for Ian's operation.

The jury ruled for the defendants. It found that Dr. Norwood was negligent. However, the jury also found that the Svindlands' proof was not adequate to establish that Dr. Norwood's cooling technique proximately caused Ian's death. The jury also found no lack of informed consent.

## II.

We have jurisdiction over the District Court's final order under 28 U.S.C. § 1291. As to matters of law, we have plenary review. North Penn. Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 68 (3d Cir. 1990). As to trial conduct and the manner of the District Court's evidentiary rulings, we review for abuse of discretion. See Pineda v. Ford Motor Co., 520 F.3d 237, 243 (2008); Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002); Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000).

## III.

Our review of the record has left us with a disquieting uncertainty – not so much as to the content of the legal rulings made by the District Court, but the manner in which those decisions were made. Thus, we do not address or decide the merits of the legal

issues raised on this appeal.[1]  What we do decide is that the District Court judge consistently failed to exercise appropriate discretion by not giving reasons for his rulings and by the manner in which he conducted the trial so that we are hard-pressed to discern the basis on which he dealt with the issues before him and particularly those matters of evidence raised during the pretrial motions and during the trial itself.

The District Court, during pre-trial proceedings on October 12, 2006, precluded the Svindlands from presenting evidence of Dr. Norwood's mortality rate for performing VSD surgeries.  The District Court also quashed a subpoena issued by the Svindlands to two non-parties seeking raw data used in two scholarly articles, which prevented them from determining, if they could, what percentage of adverse neurological outcomes could be associated with the duration of cooling.  At no time did the District Court judge give his reasons for so ruling, and while we express no opinion as to whether the material excluded from both the pretrial and the trial were relevant and material, the record is quite clear that the District Court judge virtually closed the door on allowing the Svindlands to assess the effect of the cooling rate and its duration on infants undergoing VSD surgery.

The lack of reasons given by the District Court, when combined with the manner

_____

[1]The Svindlands raise a number of issues that are more appropriately addressed by the District Court in a new trial.  These issues concern the admissibility of mortality data introduced by one of their experts, the enforceability of a subpoena issued to two non-parties, the admissibility of testimony from one of the Svindlands' prior physicians, and the legality of one of the jury instructions.  We do not address the merits of these issues in this appeal.

in which the District Court dealt with these issues with counsel, has left us with the impression that the District Court interrupted counsel to a point where intelligible argument could not be had. In fact, the District Court was often so impatient and dismissive that the record does not reflect the arguments that the Svindlands sought to make. Of even more importance is that the failure to give reasons for the District Court's rulings leaves us incapable of reviewing the basis for his actions. We should not be in the position of having to speculate as to the reasons behind each ruling and we should not be in the position of having to rule ourselves in the first instance.

We have no intention of instructing the District Court as to how it should deal with arguments, evidence, and counsel, or how it should conduct the "business" of its courtroom. However, when a record such as this one reveals numerous instances of what we can only regard as impatience and precipitous rulings on the part of the District Court judge, to say nothing of countless interruptions of counsel's arguments, our review function as a Court of Appeals is severely impaired.[2] Moreover, where we cannot determine the rationale of the District Court's rulings, many of which require explanations as to why particular testimony should be allowed while other testimony is excluded, we cannot condone the District Court's actions nor can we affirm the judgment rendered.

_____

[2]We reproduce some examples of the record in Appendix A, attached to this opinion. These portions of the record, as well as others we have not reproduced, have led to our overarching concern as to the manner the trial was conducted.

Because we are unable to complete the gaps in the Svindlands' arguments that occurred as a result of the District Court's interruptions and because we are unable to fathom the reasons why the District Court judge ruled as he did, we are obliged to vacate the judgment of May 11, 2007, and order a new trial. In light of these circumstances, it appears to us that the trial should be conducted by a District Judge other than the one who presided at the initial trial and we will accordingly order that a different judge be assigned. See, e.g., Virgin Islands v. Walker, 261 F.3d 370, 376 (3d Cir. 2001) (providing that "we can, in the exercise of our supervisory power, reassign [a] case to a different judge upon remand.... 'We must preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice.'") (quoting Alexander v. Primerica Holdings, 10 F.3d 155, 167 (3d Cir. 1993)).

_____

Cross-Examination of Dr. Norwood:

Q.     During the time you were at the Nemours Cardiac Center from the opening of clinical operations in January of 1998 until you left, did you ever submit data on your patients to the Society of Thoracic Surgeons database project?

MR. HUDGINS[3]:     Objection, Your Honor.  You saw him over this.

THE COURT:     Sustained.  Don't go there.

(Apdx. 1063, Page 178-79, Lines 24-25, 2-6)

Q.     All right.  Now, Dr. Norwood, I'm going to show you proceeding records --

MR. HUDGINS:     Objection, Your Honor.  Can we take up this document.

---

[3]Mr. Hudgins served as counsel for Appellees The Nemours Foundation and Dr. William I. Norwood.

(Begin sidebar conference)

MS. BLANCO[4]:     Your Honor --

THE COURT:     Just wait a minute.  It's his objection.

MR. HUDGINS:     My objection is this [is] a document we've never seen from the patient.  We don't know who it is, at another hospital, St. Christopher's Hospital from I'm assuming Dr. Jacobs although we don't know what it is.

THE COURT:     What is this?

MS. BLANCO:     It's a print sheet from Dr. Jacobs from 2003 that shows that this cooling was for twenty-two minutes.

THE COURT:     Let me tell you something.  I don't give a hoot about what someone else did.  This case is about this particular case.

---

[4]Ms. Blanco served as counsel for Appellants Paul and Allison Svindland.

MS. BLANCO:     Your Honor, if I may – excuse me.

THE COURT:     And I don't have – you had a series of experts testify and whatever they testified to about cooling et cetera. I'm not going to have you bring in some record, allegedly a record, from someone who isn't here to justify what he did and why. Forget it. No.

MS. BLANCO:     Can I make a statement on the record?

THE COURT:     No. No.

(End sidebar conference)

(Apdx. 1064, Pages 184-85, Lines 16-25, 1-17)

Q.     All right. Dr. Norwood, I'm going to show you – just one minute, please, while I show it to your attorney first.

THE COURT:       I want to see counsel right now.

(Begin sidebar conference)

THE COURT:       What are these?  What are these?  Have you seen any of these

before?

MR. HUDGINS:     I've never seen these before, Your Honor.

MS. BLANCO:     Yes, Your Honor.  They have seen these before.  They have

seen these before.

MR. HUDGINS:     No.  I have – I know about this patient.  I've never seen – I'm

the one who does cross-examination.  I've never seen this

document.

THE COURT:       Did you submit these things – when I asked you to exchange

exhibits, were these exhibits exchanged?

MR. HUDGINS:     No.

MS. BLANCO: This wasn't --

THE COURT: Were they exchanged?

MS. BLANCO: No. This is cross-examination now.

THE COURT: Oh, stop it.

MS. BLANCO: But, Your Honor, they've seen this and I'll tell you why they've seen it. The letter they cross-examined --

THE COURT: Did you exchange these documents?

MS. BLANCO: No, I didn't personally give it to them. No, I did not. I did not give that to them.

THE COURT: Why not?

MS. BLANCO: This is cross-examination.

THE COURT:       Why – don't start with me.  You knew about this witness.
There was nothing strange about this witness' testimony.
You had them two – I don't know how many cases you've
had with this witness --

MS. BLANCO:      Your Honor --

THE COURT:       – and you now come into court with documents you didn't
exchange with them?

MS. BLANCO:      They have this.

THE COURT:       I am not going to allow trial by ambush in my courtroom.  Do
you understand that?

MS. BLANCO:      I understand.

THE COURT:       And if you keep going down that path where I have to keep
sustaining objections, I'm going to hold you in contempt.

-13-

MS. BLANCO:         I understand.

THE COURT:         Do you understand that?  Now, sit down and forget this line

of questioning.  We'll worry about this case.

(End sidebar conference)

(Apdx. 1065, Pages 187-89, Lines 8-25, 1-25, 1-5)

Q.      Okay.  Tell us who else is cooling children for only six minutes in preparation for

deep hypothermic circulatory [arrest]?

MR. HUDGINS:      Objection, Your Honor.

THE COURT:         Sustained.

(Apdx. 883, Page 9, 19-22)

Direct Examination of Plaintiff's Expert, Dr. Adre J. DuPlessis:

-14-

Q.    With regard to cooling on bypass, do you have an opinion as to whether the time

spent doing that is important?


A.    Yes, I do.


Q.    And can you tell us what that is?


MS. PETROSKY[5]:  Objection.


THE COURT:        Sustained.... You can't answer.  This was covered in direct,

cross and we're not going to go over it again.


. . . .


Q.    Now, Dr. DuPlessis, is there anything else over the years, or that you have

discovered in this article, other than what we've already talked about, that's

served to, kind of, mold your opinion over time about cooling and circulatory

arrest?

[5]Ms. Petrosky served as counsel for Appellees The Nemours Foundation and Dr.
William I. Norwood.

A. Well, as I said earlier, I think the general message that had come across was that the changes that occurred at our institution was a more concerted effort to avoid brief cooling in order to make sure that we could adequately protect the brain and then to reduce the insult, which was to reduce the amount of time on circulatory arrest.

And the message in that paper was that the type of neurological complications which we had seen before frequently, to the point that they actually started a cardiac intensive care service that I was on for neurology – they were that frequent – that the numbers of consultations dropped down dramatically. And all that paper was doing was making an association between a change in practice, longer cooling, making sure that we didn't cool too quickly and shorter periods on circulatory arrest, making an association between those changes and a sharp reduction in the types of neurological complications we had seen previously.

Q. And on the basis of that, is that what served to –

MS. PETROSKY: Objection, Your Honor --

THE COURT: Excuse me. You're done.

(Apdx. 933, Pages 71-72, Lines 16-25, 1-15)

Direct Examination of Dr. Robert L. Hannan:

Q.      Now, under what circumstances could you foresee a death after ventricular septal

surgery?

A.      You know, a few minutes ago I mentioned the Society of Thoracic Surgeons

database.  And between 2002 and 2005 they had --

MR. HUDGINS:     Excuse me.  Your Honor.  The witness --

THE COURT:        Sustained.

(Apdx. 966, Page 21, Lines 11-17)

Q.      Now, Dr. Hannan, was there a time when you as a surgeon examined what your

institution's outcomes were with regard to cooling and circulatory arrest

MR. HUDGINS:     Objection.  Your Honor.

THE COURT:         Sustained.

(Apdx. 974, Page 50, Lines 20-24)

Q.      If you as a surgeon are going to use some type of unique technique, are you

        obligated to tell the parents about that or inform[] [them] about that?

        MR. HUDGINS:      Objection.

        THE COURT:         Sustained.

(Apdx. 974, Page 53, Lines 12-16)

Cross-Examination of Dr. Hannan:

Q.      Do you believe the person that has done this as many times as Dr. Norwood would

        not de-air the person --

        MS. BLANCO:       Objection.

-18-

BY MR. HUDGINS:

Q.      – in all honesty?

        MS. BLANCO:      Objection.

        THE COURT:      Overruled.

(Apdx. 975, Page 54, Lines 8-14)