Debbie Ellen REHM; Debbie Ellen Rehm, Executrix of the Estate of James David Rehm; Christina Marie Rehm, by and through Parent Guardian and Next Friend Debbie Ellen Rehm; and Nicholas James Rehm, by and through Parent Guardian and Next Friend Debbie Ellen Rehm, Appellants,

v.

FORD MOTOR COMPANY and Garlock Sealing Technologies, Inc., Appellees.

and

Ford Motor Company, Cross–Appellant

v.

Debbie Ellen Rehm, Executrix of the Estate of James David Rehm, Cross–Appellee.

Nos. 2009–CA–001868–MR, 2009–CA–001974–MR.

Court of Appeals of Kentucky.

Oct. 7, 2011.

Discretionary Review Denied by Supreme Court May 16, 2012.

Kenneth L. Sales (argued), Joseph D. Satterley, Paul J. Kelley, David G. Bryant, Paul J. Ivie, Louisville, KY, for Appellants.

Byron N. Miller (argued), Adam B. Shadburne, Heather R. Cash, Louisville, KY, for Appellee/Cross–Appellant Ford Motor Company.

Before CAPERTON, COMBS, and THOMPSON, Judges.

## OPINION

COMBS, Judge:

Debbie Ellen Rehm, individually and as Executrix of the Estate of James David Rehm; Nicholas James Rehm; and Christina Marie Rehm (the Rehms) appeal from the judgment of the Jefferson Circuit Court following a jury verdict in favor of

Ford Motor Company in a premises liability lawsuit. Ford Motor Company cross-appeals. Following our review of the extensive record, the facts, and the law, we affirm both as to the appeal and as to the cross-appeal.

James Rehm was the late husband of Debbie and the father of Nicholas James and Christina Marie Rehm. In January 2001, James was diagnosed with malignant mesothelioma, a form of cancer that is caused by asbestos. He had worked as a millwright (an industrial construction worker) in the late 1970s until 1981 as an employee of Rapid Installations (Rapid). After leaving Rapid sometime in 1981, he went to work as an elevator mechanic at some point in 1981. Critical to the case was the fact that the exact dates of James's employment were highly disputed at trial. James testified that he had been a millwright at Rapid from 1975 through 1982. Ford presented documentation (Social Security records) that indicated James began working at Rapid in 1977 but had stopped by March 10, 1981, the last entry for Social Security withholding listing Rapid Installations as his employer. He began as an elevator mechanic for A–1 Elevator on March 12, 1981, the starting date of employment which he listed on his application for union membership as a millwright in Local 2209.

Rapid manufactured and installed conveyer systems for other companies. Before installing new systems in manufacturing plants, Rapid's millwrights tore out the old systems. The process of removing the old systems often exposed millwrights to asbestos contained in components such as pipe insulation and boiler systems. Rapid performed this work at Ford Motor Company's Louisville Assembly Plant (LAP).

Shortly after his diagnosis of malignant mesothelioma, James Rehm and his wife and children filed the underlying lawsuit in Jefferson Circuit Court. Numerous defendants were named, including Rapid and many companies that had hired Rapid to remove their manufacturing equipment. Ford was one of the original defendants.[1] James Rehm passed away on July 5, 2002, while the lawsuit was still in the discovery phase.

After a long procedural history that is not relevant to this appeal, the Rehms and Ford[2] proceeded to trial on August 3, 2009. On August 17, 2009, the jury rendered its verdict in favor of Ford. The Rehms filed this appeal on October 6, 2009, and Ford filed a cross-appeal on October 20, 2009.

The Rehms first argue that the trial court erred by admitting old newspaper articles into evidence. The Rehms' case was based on the allegation that James Rehm was working at Ford LAP when it converted its facilities in preparation for manufacturing the Ford Ranger and Bronco and after it discontinued manufacturing the LTD. Ford's defense was that James Rehm was no longer employed as a millwright during the time of the changeover and the tear-out process; therefore, he could not have been involved. The Rehms presented witnesses who testified that James Rehm was working during the changeover. In response, Ford presented employment records showing that James

1. The judgment from which this appeal is taken was also entered against Garlock Sealing Technologies, which has filed for bankruptcy. Therefore, Garlock is subject to the automatic stay provisions of the United States Bankruptcy Code. This appeal involves only Ford.

2. The other defendants either had been granted summary judgment or had reached settlements with the Rehms.

had left Rapid in March 1981. It then produced two newspaper articles that reported that the last LTD manufactured in Louisville rolled off the line in June of 1981. Therefore, Ford contended that James could not have been involved in the changeover work that occurred after June 1981.

Our standard of review for evidentiary issues is whether the trial court abused its discretion. *Partin v. Commonwealth,* 918 S.W.2d 219, 222 (Ky.1996) *(overruled on other grounds by Chestnut v. Commonwealth,* 250 S.W.3d 288 (Ky.2008)). Our Supreme Court has defined abuse of discretion as a court's acting arbitrarily, unreasonably, unfairly, or in a manner "unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

The Rehms contend that the newspaper articles should not have been admitted because they are hearsay. In fact, the court admitted on the record that newspaper articles are "the most specious form of hearsay." However, the judge decided to admit the articles pursuant to the ancient-documents exception to the hearsay rule. Kentucky Rule(s) of Evidence (KRE) 803(16) provides that even if they are hearsay, "[s]tatements in ancient documents . . . in existence twenty (20) years or more the authenticity of which is established" may be admitted into evidence.

The articles at issue were twenty-eight years of age. The Rehms argue that they were not properly authenticated. However, according to KRE 902(6), newspaper articles are self-authenticating. Although no published Kentucky cases have applied the ancient-document exception, Professor Lawson acknowledges that the rule is applicable to newspaper articles. Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 8.85(4), at 730 (4th Ed.2003).

We have reviewed the cases that the Rehms submitted to support their argument that the articles were inadmissible hearsay. All of them are distinguishable from the facts before us because none of them involved newspaper articles old enough to qualify as eligible for the ancient-document exception. They were contemporaneous with the proceedings for which they were offered. *See Bowling v. Lexington–Fayette Urban Cnty. Gov't,* 172 S.W.3d 333, 342 (Ky.2005); *Shirley v. Commonwealth,* 378 S.W.2d 816, 818 (Ky. 1964); *Turner v. City of Taylor,* 412 F.3d 629, 651 (6th Cir.2005); *Barbo v. Kroger Co.,* 2007 WL 2350183, at *2 (W.D.Ky. Aug. 13, 2007); *Gantt v. Whitaker,* 57 Fed. Appx. 141, 149 (4th Cir.2003); *Spotts v. U.S.,* 562 F.Supp.2d 46, 54–55 (D.D.C. 2008); *Eisenstadt v. Allen,* 113 F.3d 1240 (9th Cir.1997).

Additionally, we note that neither the Rehms nor Ford could produce any other written documentation pertaining to the actual dates involving the plant changeover. Each produced witnesses who were asked to recall events of nearly thirty years ago regarding dates that were a mere two months apart. James provided detailed testimony of working at Ford during the changeover; he testified that for several months during that period he had worked in the Ford plant seven days per week—including holidays and Saturdays. Ford presented written evidence that James had left Rapid in March 1981— prior to the changeover date of June 1981 recounted in the newspaper articles. Bolstering the pertinence of the articles was the testimony of one of Ford's witnesses, who related that the plant would not have retained records relating to the changeover beyond five or six years. The evidence was undeniably tenuous. But we are persuaded that the newspaper articles were more probative than prejudicial in aiding the jury in its finding of fact con-

cerning whether James could have participated in the changeover.

The Rehms argued that the tearing out of equipment *could have begun before* the last LTD rolled off the assembly line (June 1981). They presented testimony to that effect and reiterated that theory in closing argument. The trial court admonished the jury that the articles were not necessarily true, leaving to the jury the ultimate task of fact-finding based on conflicting evidence derived from the newspaper articles *versus* witness recollection. Based on the lengthy passage of time in this case involving some thirty years, the trial court did not abuse its discretion in admitting the newspaper articles under the ancient-documents exception to the hearsay rule.

The Rehms' next arguments are related to the trial court's allowing testimony from Ford's expert witness, Dr. Robert Morgan, an occupational epidemiologist. Dr. Morgan offered his theory that James had developed mesothelioma as a result of household exposure to his own father's work clothes. The elder Mr. Rehm had worked as an elevator mechanic, and Dr. Morgan speculated that he could have carried home asbestos in his hair and on his clothing. Dr. Morgan also mentioned that James had been exposed to asbestos in plants other than Ford as possible alternate sources of contamination.

The Rehms argue that Dr. Morgan's household exposure theory is speculative and without foundation because James's father testified that he had never been exposed to asbestos during his work as an elevator mechanic. They also contend that the testimony was prejudicial in giving the jury the suggestion that James's own work as an elevator mechanic could have been the source of his exposure to asbestos.

Rehm also contends that Dr. Morgan's testimony about the household exposure

was unreliable. KRE 702 sets forth the standards for expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Additionally, the Supreme Court of the United States has provided a list of factors to assist the trial court in its determination: 1) whether the expert's theory can be or has been tested; 2) whether the expert's theory has been published or subject to peer review; 3) a scientific technique's potential rate of error and standards for its operation; and 4) the general acceptance of the theory in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593–94, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993).

In its restatement of *Daubert,* the Supreme Court of Kentucky has admonished that the standard is flexible—"a court may consider one or more or all of the factors mentioned in *Daubert,* or even other relevant factors, in determining the admissibility of expert testimony." *Toyota Motor Corp. v. Gregory,* 136 S.W.3d 35, 40 (Ky. 2004) (quoting *Johnson v. Commonwealth,* 12 S.W.3d 258, 264 (Ky.2000)).

Our Supreme Court has recently evaluated a case very much like the one before us, *Burton v. CSX Transp., Inc.,* 269 S.W.3d 1 (Ky.2008). In *Burton,* as in this case, the trial court was not assessing the

reliability of a "particular theory or technique" as indicated by *Daubert.* Instead, Ford presented general theories of a causal link between domestic exposure and mesothelioma and of higher risk in elevator mechanics. In *Burton,* the court held that when expert testimony was based on literature, the expert must be "sufficiently qualified in the proper field of study to offer an opinion that is helpful to decide the specific questions presented." *Id.* at 7. If the expert is qualified, then the testimony will "pass muster under the *Daubert* rubric." *Id.*

Dr. Morgan reviewed two articles detailing studies which had concluded that elevator mechanics carry a greater risk of developing asbestos-related diseases than the general population. He further recounted that it was established fact that household exposure can be a source of mesothelioma.

■ The parties do not dispute Dr. Morgan's qualifications as an expert in asbestos-related diseases. He has many years of experience as an epidemiologist and has published articles pertaining to asbestos-related diseases. He developed a mathematical model to aid in determination of when a patient's asbestos exposure occurred (which was not applied in this case). Therefore, we must conclude—as did the trial court—that Dr. Morgan was sufficiently qualified to review the literature pertaining to high risk for asbestos-related disease in elevator mechanics.

■ Admittedly, the evidence for the home-exposure theory was weak. In its assessment of Dr. Morgan's proffered testimony, the trial court acknowledged that it "flew in the face" of ninety percent of the evidence. However, we do not agree that it was admitted erroneously. It is settled law that in evidentiary matters, the trial court serves as a gatekeeper to prohibit unreliable expert testimony, but the jury bears the sole responsibility for assessing the weight of the testimony. *Commonwealth v. Martin,* 290 S.W.3d 59, 67 (Ky.App.2008). Our courts have repeatedly held that the weaknesses of an expert's testimony are subject to being discredited upon effective cross-examination. *U.S. v. L.E. Cooke Co., Inc.,* 991 F.2d 336, 342 (6th Cir.1993); *U.S. v. 0.161 Acres of Land,* 837 F.2d 1036, 1040 (11th Cir.1988); *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002); *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1345 (11th Cir.2003).

In our thorough examination of the record, we particularly scrutinized the Rehms' cross-examination of Dr. Morgan. It was robust, thorough, and effective. The Rehms cast considerable doubt on the viability of the home-exposure theory and undermined the theories presented by Dr. Morgan. During cross-examination, Dr. Morgan admitted that as of the time of trial, no known cases of asbestos-related disease had ever been diagnosed in any elevator mechanic in Louisville. It was the sole province of the jury to evaluate the conflict clearly demonstrated and highlighted by the effective cross-examination. As our court remarked in *Martin,* "[w]e are confident that Kentucky juries can hear ... expert testimony and weigh it accordingly." *Commonwealth v. Martin,* 290 S.W.3d at 69.

■ The Rehms also argue that the trial court improperly allowed Dr. Morgan to provide testimony that was not disclosed prior to trial. In his deposition, Dr. Morgan stated that he would testify only regarding the home-exposure theory. However, during the trial, he alluded to James's potential occupational exposures in plants other than Ford. The trial court agreed that the testimony was improper and admonished the jury that it could

"consider the fact that he did not previously disclose that opinion and when asked about it did not offer that opinion as part of your evaluation of his credibility."

A jury verdict is not easily disturbed or disregarded. Kentucky Rule(s) of Civil Procedure (CR) 61.01 provides that appellate courts may not overturn a verdict or disturb a judgment based on an evidentiary error unless the error or defect had affected "the substantial rights of the parties." In this case, Dr. Morgan's testimony lasted a few hours in a trial that included nearly two weeks of testimony. In addition to their vigorous cross-examination of Dr. Morgan, the Rehms also presented a strong closing argument. His opinions were a proper subject for the jury's analysis and were not erroneously considered by the jury under the directives of CR 61.01. Furthermore, Dr. Morgan's fleeting reference to James's exposure from other locations did not prejudice the Rehms; the jury had been made aware of them from other testimony presented in the Rehms' case-in-chief.

■ The Rehms also appealed the trial court's dismissal of their loss of consortium claims. Debbie, Christina, and Nicholas Rehm all sought damages for the loss of their husband and father.

The trial court dismissed the loss of consortium claims because James's exposure to asbestos occurred prior to his marriage to Debbie and before the children were born. The Rehms argue that dismissal was improper because the injury did not occur until James developed the disease well into his marriage and after the births of the children. They are correct in so contending.

The Supreme Court of Kentucky addressed this very issue in *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187 (Ky.1994). Bailey had sued Capital Holding after he was exposed to asbestos in a building owned by Capital Holding. Bailey had not developed any symptoms of an asbestos-related disease. The Court held that without actual symptoms, Bailey did not have an actionable injury and that a cognizable claim did not come into being until the injury occurred.

In *Louisville Trust Co. v. Johns–Manville Products*, the plaintiff died from "lung cancer ['mesothelioma'], caused by breathing asbestos dust and fibers," and his estate sued Johns–Manville on "a theory of products liability arising from an alleged failure to adequately warn of known dangers associated with the inhalation of asbestos dust." 580 S.W.2d [497,] at 498 [ (Ky.1979) ]. The issue was whether "to extend the discovery rule of our medical malpractice case to tort actions for injury resulting from a latent disease caused by exposure to harmful substance." *Id.* at 499. We held "that when an injury does not manifest itself immediately, the cause of action should not accrue when the injury was initially inflicted, **but when the plaintiff knew or should have known that he had been injured by the conduct of the tortfeasor.**" *Id.* at 500. [Emphasis added.] The portion of the *Johns–Manville* opinion which is critical for present purposes is a quotation from *Saylor v. Hall*, Ky., 497 S.W.2d 218, 225 (1973) incorporated into the opinion at 580 S.W.2d at 500:

"A cause of action does not exist until the conduct causes injury that produces loss or damage."

Thus we recognized that with a substance capable of causing cancer, just as with any other defective product, **no cause of action accrues until the potentially harmful exposure actually "causes injury that produces loss or damage."** [Emphasis added.]

This rule is fair to both plaintiff and defendant: it protects the plaintiff from a statute of limitations cutting off a cause of action before it accrues, and it affords the defendant the benefit of the traditional principle that for negligent conduct to be actionable it must not only create an unreasonable risk of harm but it must be a substantial factor in causing a harmful result.

*Capital Holding Corp. v. Bailey*, 873 S.W.2d at 192.

James's injury occurred when the mesothelioma became manifest rather than upon mere exposure. Although it was error for the trial court to dismiss his family's loss of consortium claims, the error is moot because it pertains to damages. Since it is derivative upon a finding of damages, which was rejected by the jury, it cannot now be considered anew.

■ Since we are affirming the trial court's judgment, Ford's cross-appeal is moot. However, we will address the merits. Ford first argues that the trial court erred when it denied Ford's motion for summary judgment based upon up-the-ladder immunity. We disagree.

In *General Elec. Co. v. Cain*, 236 S.W.3d 579 (Ky.2007), the Supreme Court of Kentucky decided that Ford is not subject to up-the-ladder immunity. On remand in the present case, which is the subject of this appeal, Ford presented the trial court with affidavits from Ford employees that contradicted the Supreme Court's holding and filed a motion for summary judgment. The trial court denied the motion.

■■ It is well established that a "final decision of [the Supreme] Court, whether right or wrong, is the law of the case and is conclusive of the questions therein re-

solved. It is binding upon the parties, the trial court, and the Court of Appeals." *Ellison v. Commonwealth*, 994 S.W.2d 939, 940 (Ky.1999). It is a trial court's duty to apply the decision of an appellate court. *Buckley v. Wilson*, 177 S.W.3d 778, 781 (Ky.2005). Therefore, Ford's new evidence was irrelevant and should not have been considered. We affirm the trial court's denial of Ford's motion for summary judgment because the Supreme Court had already determined the issue of up-the-ladder immunity as the binding law of the case. *Inman v. Inman*, 648 S.W.2d 847, 849 (Ky.1982).

■ Ford next argues that the trial court should not have admitted a group of exhibits referred to as "the Sugano documents." Among those documents were internal memoranda (dating from August 25, 1975, through August 14, 1980) listing Ford employees who had died as a result of mesothelioma. Ford alleges that the documents were prejudicial because they do not refer to any employees at the Louisville plant or to any millwrights. On the other hand, the Rehms contend that the documents[3] were relevant to prove negligence. We agree.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. All relevant evidence is admissible unless excluded by some other rule. KRE 402. If the probative value of relevant evidence is "substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or

---

**3.** Ford's brief refers both to "the memo" and "Sugano documents." Its objection in the record pertains to several documents. Since the analysis is the same for all of them, we will refer to the "group of documents."

needless presentation of cumulative evidence," it may be excluded. KRE 403.

The Rehms contend that the Sugano documents were relevant to prove an element of negligence; *i.e.*, that Ford was aware of the risky circumstances to which it subjected its LAP employees and contractors. *See CSX Transp., Inc. v. Moody*, 313 S.W.3d 72, 82 (Ky.2010). We agree. The documents had the tendency to prove that Ford was aware that working with asbestos is hazardous. The trial court admitted them for the limited purpose of showing that Ford had notice of the risks—not as proof that James Rehm's mesothelioma was caused by asbestos at LAP.

■■■ Although Ford argues that it was unduly prejudiced, we do not agree. The jury found in Ford's favor. All relevant evidence is potentially prejudicial to the party against whom it is offered. Lawson, *supra*, at § 2.10(4)(b) at 89. Evidence that is unduly prejudicial "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Id.* (quoting *Carter v. Hewitt*, 617 F.2d 961, 972 (3rd Cir.1980)). Ford has not offered any proof of such prejudice, and, therefore, we conclude that the trial court did not abuse its discretion.

Ford's final argument on cross-appeal is that the trial court erred by denying Ford's motion to dismiss the Rehms' claims pursuant to the Kentucky Occupational Safety and Health Act (KOSHA). That argument is moot in light of the jury verdict and our decision affirming.

We affirm the judgment of the Jefferson Circuit Court both as to the appeal and as to the cross-appeal.

CAPERTON, Judge, Concurs in Part, Dissents in Part and Files Separate Opinion.

THOMPSON, Judge, Concurs in Result and Files Separate Opinion.

CAPERTON, Judge, Concurring in Part and Dissenting in Part:

I concur with the learned majority on the cross-claim of Ford Motor Company concerning the denial of its summary judgment motion. Otherwise, I dissent.

First, I address the testimony of Dr. Morgan on the theory of household exposure to asbestos which supported Ford's theory that Rehm's father could have been exposed to asbestos because of his occupation and, in turn, exposed Rehm to asbestos. Rehm's father provided the only testimony on this issue and testified that he had not been exposed to asbestos. Since there was no evidence to the contrary, the introduction of testimony from Dr. Morgan on the household exposure theory was error because it was without basis, irrelevant and prejudicial. Additionally, this evidence affected the substantial right of Rehm to a fair trial and is not harmless. I would reverse the trial court and remand for a new trial.

Secondly, I address the admission into evidence of the newspaper article under KRE 803(16). Initially, I note that this evidentiary exception to the hearsay rule is not frequently used and, as a result, only a limited number of cases discuss it. Additionally, this exception is not a wide open door but a narrow crevice, as shall be apparent from the following analysis.

Of the several cases that discuss such an exception, only two will be discussed: *Columbus–America Discovery Group, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 742 F.Supp. 1327 (E.D.Va. 1990), and *Hicks v. Charles Pfizer & Co., Inc.*, 466 F.Supp.2d 799 (E.D.Texas 2005).

True, they discuss the Federal Rules of Evidence (Fed.R.Evid.), but, for our purposes, Fed.R.Evid. 803(16) and Fed. R.Evid. 805 are essentially the same as our Kentucky Rules of Evidence. I quote the two cases at length and in detail in hopes that the reasoning therein and the cases they cite will provide for robust debate of the confines of KRE 803(16), and caution that my analysis is not meant to be an exhaustive dissertation.

In *Columbus–America Discovery Group* the court stated:

First, the Court must consider whether the newspaper accounts are subject to the hearsay objection raised at trial.

*Rule 802 of the Federal Rules of Evidence* provides:

Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by act of Congress.

*Rule 803* of said rules provides:

That the following are not excluded by the hearsay rule[:]

(16) Statements in ancient documents. Statements in a document in existence twenty years or more the authenticity of which is established.

In a discussion of the admissibility of hearsay, we begin with the established principle that cross-examination is of vital importance in establishing the value and trustworthiness of such evidence. The requirement the witness be sworn, testify in the presence and hearing of the trier and be subject to cross[-] examination is lost in most instances of hearsay. The restriction in the admissibility of ancient documents is "the authenticity of which is established." *The purpose of the admission and exactly what is sought to be established by the item will often determine its admissibility.* For instance, in *Dallas County v. Commer-*

*cial Union Assurance Co.*, 286 F.2d 388 (5th Cir.1961), a 58[-]year[-]old newspaper story was admitted to prove the occurrence of a fire in a public building. However, the same Court in *Poretto v. United States*, 196 F.2d 392, 395 (5th Cir.1952) ruled that newspaper articles are not admissible to prove facts stated therein. In *Montana Power Co. v. Federal Power Commission*, 185 F.2d 491 (D.C.Cir.1950), *cert. denied*, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 [ (1951) ], old newspaper accounts on the question of navigability of the Mississippi River during the 19th century were admitted to prove navigability at that earlier date. The question often arises as to whether assertive statements in the article are admissible. In *Wathen v. United States*, 527 F.2d 1191, 1199 (Ct.Cl.1975), the Court in considering a newspaper account of a shooting, held it hearsay, but said "that insofar as they reported the fact of the shooting, resulting in death observed by witnesses, they provided reliable and substantial evidence."

*Columbus–America Discovery Group* at 1342 (emphasis supplied.)

In *Hicks* the court stated:

█ The Hicks assert that the ancient documents exception should be applied to render the newspaper articles admissible. This exception provides that "[s]tatements in a document in existence twenty years or more the authenticity of which is established" are admissible. *FED.R.EVID. 803(16).* Under the Federal Rules of Evidence, newspaper articles are self-authenticating. *See FED. R.EVID. 902(6); Woolsey v. National Transp. Safety Bd.*, 993 F.2d 516, 520 (5th Cir.1993), *cert. denied*, 511 U.S. 1081, 114 S.Ct. 1829, 128 L.Ed.2d 459 (1994); *Perez v. Alcoa Fujikura, Ltd.*, 969 F.Supp. 991, 998 (W.D.Tex.1997).

The dangers of hearsay relate to flaws in perception, memory, narration, and sincerity. *See Park v. Huff,* 506 F.2d 849, 865 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975) (citing Morgan, *Hearsay Dangers & the Application of the Hearsay Concept,* 62 HARV. L.REV. 177, 218 (1948)); JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 245 (5th ed.2003). An assertive statement found in an ancient document is more likely to be truthful because "age affords assurance that the writing antedates the present controversy," as such a document must have been written before the current motive to fabricate arose. *See United States v. Stelmokas,* No. 92–3440, 1995 WL 464264, at *6 (E.D.Pa. Aug. 2, 1995), *aff'd,* 100 F.3d 302 (3d Cir.1996), *cert. denied,* 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997); *JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 323 (5th ed.2003); FED. R.EVID.* 803(16) NOTES OF ADVISORY COMMITTEE ON 1972 PROPOSED RULES. Moreover, the requirement that an ancient document be written protects against the danger of inaccurate narration. *See Stelmokas,* 1995 WL 464264, at *6; *JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 323 (5th ed.2003).* Finally, an ancient document is more likely to be accurate than the memory of a person after the passing of a lengthy period of time. *See Dallas County,* 286 F.2d at 396–97; *Stelmokas,* 1995 WL 464264, at *6; *JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 323 (5th ed.2003).* Thus, if the author of the ancient document had personal knowledge of the substance underlying the relevant assertive statements, then *Rule 803(16)* clearly applies.

The crucial issue, however, is whether *Rule 803(16)* inoculates all assertive statements contained within an ancient document, including double hearsay, against application of the general prohibition against hearsay contained in *Rule 802.* The rationale of *Rule 803(16)* in permitting the admission of statements in ancient documents where the author is the declarant does not justify the admission of double hearsay merely because of its presence in an ancient document. The danger of faulty perception persists unabated because a narrator, such as a reporter, may not properly record the remarks of the speaker. *See Stelmokas,* 1995 WL 464264, at *6; Greg Kettles, *Ancient Documents & the Rule Against Multiple Hearsay,* 39 SANTA CLARA L.REV. 719, 735 (1999). More generally, the risk of deception or mistake is compounded with each additional layer of hearsay, as any error will inevitably be passed on regardless of the accuracy or sincerity of the author of the ancient document or prior relators. *See id.*

Courts are divided as to the proper application of *Rule 803(16)* to ancient documents involving double hearsay. One position is that a separate hearsay exception must apply to each layer of hearsay contained within the ancient document to warrant admission of the specific statement into evidence. *See United States v. Bronislaw Hajda,* 135 F.3d 439, 444 (7th Cir.1998) (holding that "if the [ancient] document contains more than one level of hearsay, an appropriate exception must be found for each level") (citing *FED.R.EVID.* 805); *Columbia First Bank, FSB v. United States,* 58 Fed.Cl. 333, 338 (Fed.Cl.2003) (noting that if *Rule 803(16)* were read so as to inoculate multiple levels of hearsay, "*Rule 805* would be superfluous") (citing *Stelmokas,* 1995 WL 464264, at *5–6). Analogously, the Fifth Circuit

requires that a separate hearsay exception be applicable to each level of hearsay in a business record to render the document admissible. *See United States v. Ismoila,* 100 F.3d 380, 392–93 (5th Cir.1996), *cert. denied,* 520 U.S. 1219, 117 S.Ct. 1712, 137 L.Ed.2d 836 (1997), 520 U.S. 1247, 117 S.Ct. 1858, 137 L.Ed.2d 1060 (1997) (explaining that double hearsay is admissible only when each layer is excused by a hearsay exception) (citing *United States v. Baker,* 693 F.2d 183, 188 (D.C.Cir.1982)).

Some courts have implied that multiple levels of otherwise inadmissible hearsay may be admitted under **Rule 803(16).** *See Murray v. Sevier,* 50 F.Supp.2d 1257, 1265 n. 6 (M.D.Ala. 1999) (permitting statements made in an interview in a newspaper article to be used under **Rule 803(16),** *vacated on other grounds, Murray v. Scott,* 253 F.3d 1308 (11th Cir.2001); *Gonzales v. North Twp. of Lake County,* 800 F.Supp. 676, 681 (N.D.Ind.1992), *rev'd on other grounds,* 4 F.3d 1412 (7th Cir. 1993)) ("As the newspaper articles in Exhibit C are well more than twenty-years old, the statements contained within are admissible into evidence . . . .") (citing *Ammons v. Dade City,* 594 F.Supp. 1274, 1280 n. 8 (M.D.Fla.1984), *aff'd,* 783 F.2d 982 (11th Cir.1986) (admitting newspaper articles to prove the existence of a street paving program in 1925 without inquiry into the double hearsay issue); *Bell v. Combined Registry Co.,* 397 F.Supp. 1241, 1246–47 (N.D.Ill.1975), *aff'd,* 536 F.2d 164, 166–67 (7th Cir.1976) (receiving into evidence newspaper articles detailing the use of a poem to further good works and announcing the poet's death)); *JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 323 (5th ed. 2003)* ("The more common tendency appears to be to admit newspaper articles over 20 years old without the proper inquiry.").

*Better reasoned authority indicates that the ancient documents exception permits the introduction of statements only where the declarant is the author of the document. Even if a document qualifies as ancient under **Rule 803(16),** other hearsay exceptions must be used to render each individual layer of hearsay admissible. This interpretation best reconciles the underlying justifications of **Rule 803(16)** with the limitations of Rule 805. See Columbia First Bank, FSB,* 58 Fed.Cl. at 338; *Stelmokas,* 1995 WL 464264, at \*6. *Rule 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule. . . ." FED.R.EVID. 805.* "[A]s long as there is no 'positive repugnancy' between two laws . . . a court must give effect to both." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citing *Wood v. United States,* 41 U.S. 342, 16 Pet. 342, 363, 10 L.Ed. 987 (1842)). *Rule 805 would be superfluous if the explicit hearsay exceptions excused double hearsay. Therefore, the canons of statutory interpretation compel this court to give effect to Rule 805 as well as **Rule 803(16),** rendering the newspaper articles inadmissible under the ancient documents exception to the hearsay rule.*

*Hicks* at 804–807 (emphasis supplied).

A reading of both *Columbus–America Discovery Group* and *Hicks* leaves me with multiple conclusions: (1) We must, in applying any exception, remember that cross-examination is vital in establishing the value and trustworthiness of evidence and that when a hearsay exception is applied, the benefits of a sworn witness, tes-

tifying in the presence of the trier of fact and subject to cross-examination, are often lost; (2) The purpose of the evidence will often determine its admissibility under KRE 803(16); (3) A newspaper may avoid the pitfalls of recent fabrication, inaccurate narration and faded memory; and lastly, (4) The rationale of Rule 803(16) does not justify the admission of multiple levels of hearsay merely because they are present in an ancient document.

I would align with the reasoning of *Hicks* and find that the ancient-documents exception found in KRE 803(16) permits the introduction of statements only where the declarant is the author of the document. If multiple levels of hearsay exist, then each level must meet a hearsay exception to be admissible because this interpretation of KRE 803(16) reconciles it with KRE 805 and avoids the faulty interpretation or perception an author may have of another's statements.

In applying these conclusions to the newspaper admitted into evidence *sub judice,* which stated that the last Ford LTD rolled off the line on a particular date, I conclude it was admissible for the purpose of showing that a Ford LTD did roll off the line on that date but would require a showing that, either the author-declarant knew it was the last LTD through his personal knowledge, or, that the hearsay upon which he relied in determining it to be the last LTD met a hearsay exception pursuant to KRE 805. Because there was no showing of the author-declarant's knowledge that the LTD was the last LTD or that the hearsay upon which he relied met an exception to KRE 805, it should have been excluded. This evidence was of importance, detrimental to Rehm's case, and affected his substantial right to a fair trial. Therefore, I would reverse the decision of the trial court admitting the evidence and remand for a new trial.

Last, I address the consortium claim asserted by Rehm. I agree with *Capital Holding Corporation v. Bailey,* 873 S.W.2d 187 (Ky.1994) that a cause of action does not accrue until the exposure to asbestos causes the injury that produces the loss or damage. A plain reading of Kentucky Revised Statutes (KRS) 411.145 would allow the claim to be asserted by Rehm against Ford. Therefore, I would reverse the trial court on this issue.

THOMPSON, Judge, Concurring:

I concur in the result reached by the majority but I disagree that Dr. Morgan's testimony and the Sugano documents were admissible. However, I believe the errors were harmless and, therefore, agree that the jury's verdict should be affirmed.

Dr. Morgan is qualified as an expert in asbestos-related diseases and support exists for the theory that mesothelioma can develop from exposure to asbestos-contaminated clothing. The evidence was nevertheless inadmissible because there was no evidence that James's father was ever exposed to asbestos. Dr. Morgan's general testimony regarding his household exposure theory was irrelevant absent evidence that James's father was, in fact, exposed to the toxin during the course of his employment. However, James's father's alleged exposure to asbestos was mentioned briefly in closing and there was admissible evidence that James's mesothelioma was caused by sources other than his employment with Rapid and his work at Ford. Therefore, the error was harmless.

Likewise, the Sugano documents were irrelevant. There was no evidence that James worked in substantially similar conditions as the employees referred to in the documents. James had not worked at the plants identified in the documents and the work performed by the employees at those plants differed from those performed by

James. Therefore, the documents did not tend to prove it more or less probable that James contracted mesothelioma in the course of his employment. KRE 401. However, because the jury's verdict was in Ford's favor, the error must be considered harmless.